Jack H. HARDY, Appellant,

v.

SOUTH BEND SASH & DOOR CO., INC., G. Scott Frisk, Arthur W. Frisk, and Freddie D. Rowe, Appellees.

No. 50A03–9203–CV–88.

Court of Appeals of Indiana, Third District.

Nov. 25, 1992.

Rehearing Denied Jan. 13, 1993.

David T. Stutsman and Douglas A. Mulvaney, Stutsman & Mulvaney, Elkhart, for appellant.

Richard W. Morgan and Joseph Fullenkamp, Barnes & Thornburg, South Bend, for South Bend Sash & Door Co., G. Scott Frisk and Freddie D. Rowe.

John J. Lorber and Robert J. Palmer, May, Oberfell & Lorber, South Bend, for Arthur W. Frisk.

STATON, Judge.

Jack Hardy sold his stock in South Bend Sash and Door Corporation (Sash and Door) under the terms of a Stock Purchase Agreement. Later, he brought this action alleging among other things that the purchasers breached the agreement. The trial court granted the purchasers' motion for summary judgment. Hardy's appeal raises five issues which we have consolidated and restated as follows:

I. Whether the trial court erred in finding no genuine issues of material fact as to:

 A. whether the Defendants breached the December 1978 Stock Purchase Agreement; and

 B. the fraud or constructive fraud claims.

II. Whether the trial court erred in finding no genuine issues of material fact as to the conspiracy claim.

III. Whether the trial court erred in determining there were no genuine issues of material fact as to the punitive damages claim.

We affirm.

Sash and Door is a closely held corporation. Hardy began working for Sash and Door in 1963 as a salesman. In December of 1978, the three shareholders, Arthur Frisk (Arthur), Shimp (now deceased), and Hardy, agreed to sell Sash and Door stock to G. Scott Frisk (Scott), and Freddie Rowe. Also at this time, Scott and Rowe became Sash and Door Directors, and the five shareholders entered into a Stock Purchase Agreement (the "Agreement"). Its articles relevant to this appeal are as follows:

### Article I

No Stockholder ... shall in anyway transfer or dispose of any portion of his capital stock ... unless he shall first offer to sell such stock to another Stockholder.... If any such other Stockholder elects to purchase any or all of such shares, the purchase shall be at a price not less than that determined in accordance with the provisions of ARTICLE IV....

\* \* \* \* \* \*

### Article III

Upon the termination of a Stockholder's tenure as an officer of the Corporation, the Stockholder shall sell and the surviving Stockholders of the Corporation shall buy all of his shares of capital stock in the Corporation at a price determined in accordance with the provisions of ARTICLE IV.

### Article IV

\* \* \* \* \* \*

The price to be paid for the purchase of shares of stock of the Corporation, as provided for in ARTICLE IV shall be determined periodically by mutual agreement of the Stockholders. The initial purchase price is hereby agreed upon as $2000.00 per share. This price shall be

redetermined within 45 days following the close of each fiscal year of the Corporation and shall be endorsed upon Schedule B (Purchase Price of Stock Interest) of the copy on file with the Secretary of the Corporation. Until such redetermination, the prior value shall continue in effect.

\*　　\*　　\*　　\*　　\*　　\*

Record, pp. 28–32.

Between December of 1978 and June of 1988, several stock transfers occurred. During May 1982, Shimp sold Scott and Rowe five shares each for $2000.00 a share. In March of 1984, Shimp sold his last fifteen shares to Scott, Rowe, and Arthur. Each purchased five shares and paid $2000.00 per share. Prior to purchasing five of these shares, Arthur offered them to Hardy, who declined. During March 1986, Arthur sold forty-five shares of his stock to Scott for $2000.00 per share. During all of these transfers, the shares were offered to and purchased by another Shareholder of Sash and Door, at the purchase price stated in Article IV.

At the shareholders' and directors' meetings in March 1986, Arthur announced his retirement as Sash and Door's president. Scott became the new president, and Rowe replaced Hardy as Sash and Door's vice-president. The Article IV stock value remained $2000.00 per share. Later, at the December, 1987 directors' meeting, Hardy's letter of resignation from the sales force was accepted, and the letter stated that his resignation would be effective on December 31, 1987. Additionally, a $1200.00 per share dividend was declared.

Again, on April 11, 1988, directors' and shareholders' meetings were held. The shareholders were: Arthur, Scott, Rowe, and Hardy.[1] At the directors' meeting, the Directors voted to recommend to the shareholders that they decrease the number of Directors from five [2] to three and that the shareholders increase the Article IV stock price to $3000.00. Additionally, they declared a $2500.00 per share dividend. The Directors' recommendations were approved. Arthur and Hardy were not re-elected as Directors.

On May 18, 1988, the surviving officer-shareholders, Rowe and Scott, sent notification of their intent to purchase Arthur's and Hardy's Sash and Door stock as provided in Article III of the Agreement. Rowe and Scott offered $3000.00 per share in accordance with Article IV of the Agreement.

## I.

### Standard of Review

Summary judgment is appropriate only when the movant has demonstrated there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. Ind.Trial Rule 56(C). The burden to prove this lies solely on the movant. Once the movant has sustained this burden, the non-movant must respond by setting forth specific facts showing a genuine issue for trial; the non-movant may not simply rest on the allegations. T.R. 56(E).

In *Stephenson v. Ledbetter* (1992), Ind., 596 N.E.2d 1369, 1371, the appellate standard for summary judgment was given:

> The trial court's decision on a motion for summary judgment enters the process of appellate review clothed with a presumption of validity. The party appealing from the grant of summary judgment must persuade the appellate tribunal that the judgment was erroneous. The reviewing court faces the same issues that were before the trial court and follows the same process. [citation omitted]. The trial court determination must be "carefully scrutinized on appeal" to assure that the non-prevailing party is not improperly prevented from having his day in court. [citation omitted]. We are not limited to reviewing the trial court's reasons for granting summary judgment, but will affirm a grant of sum-

---

[1]. Of the one-hundred outstanding shares of Sash and Door stock, Arthur owned fifteen shares, Hardy owned ten, Rowe owned fifteen, and Scott owned the remaining sixty shares.

[2]. The fifth director was Dorothy Frisk. She was elected to the Board of Directors in 1987. Record, p. 462.

mary judgment if it is sustainable on any theory or basis found in the record. [citation omitted].

### A.

Hardy suggests issues of material fact exist in his claim that the 1978 Agreement was breached. He suggests issues of material fact exist in four areas: first, the Agreement does not clearly express an intent to deviate from market value as the method of valuation;[3] second, the stock sales after December of 1978 occurred without written notice to the other shareholders; third, the Defendants misrepresented and withheld Sash and Door's true financial condition from him; and fourth, the Defendants withheld the true value of the stock from him.

■ First, relying on *Battershell v. Prestwick Sales, Inc.* (1992), Ind.App., 585 N.E.2d 1, 6, Hardy suggests parties who intend to deviate from the market value as a method of valuation for their stock must clearly express that intent. Hardy proposes the Agreement "does not clearly indicate what method of evaluation [sic] the parties intended to use." Reply Brief, p. 19. Prior to examining Hardy's argument, it is helpful to review Indiana's position on buy and sell agreements in closely held corporations.

■ Indiana permits the shareholders in closely held corporations to enter into fixed price stock agreements because there is seldom a market for those shares, and it is difficult and speculative to value those shares. *See Krukemeier v. Krukemeier Machine & Tool Co., Inc.* (1990), Ind.App., 551 N.E.2d 885, 890. The parties to such agreements are free to use methods of valuation other than "book value". *Krukemeier, supra,* at 890. Under such agreements, it is for the parties to determine the method of valuation, not the courts. *Id.* In *Stech v. Panel Mart, Inc.* (1982), Ind. App., 434 N.E.2d 97, 102, the court upheld a buy and sell agreement's valuation of stock which was "established by the stockholders at each annual meeting of the company." The Article IV value was to "be determined periodically by mutual agreement of the stockholders." Record, p. 30. The Agreement here clearly indicates the method of valuation desired by the parties at the formation. *See also, O'Neal & Thompson, O'Neal's Close Corporations* § 7.31 (3rd Ed.) (recognizing "mutual agreement" as a method of valuation).

■ Second, Hardy suggests the sale of stock to another shareholder without a written offer to all the other shareholders violates the Agreement. The Agreement, in Article I, requires the shares be first offered to "another shareholder" before being sold to a non-shareholder. Record, p. 28. No language in the Agreement requires that the selling shareholder shall provide written notice of the offer to all shareholders or that the offer to sell shall be made to all shareholders. The Agreement was not breached when stock was sold between shareholders without written notice to the other shareholders from 1978

---

**3.** Hardy also asserts the Article IV redetermination was waived by the Defendants because they failed to make annual redeterminations. The record reflects that the 1978 Agreement sets the Article IV price at $2000.00 per share. While the minutes from the shareholders' meetings from 1978 to 1985 were lost or misplaced, the Agreement provided that until a redetermination occurred the prior value shall continue in effect. Record, p. 30. All transfers of Sash and Door's stock from December, 1978 until the April, 1988 redetermination were at $2000.00 per share.

On March 14, 1986, a shareholders' meeting was called, and Hardy waived notice of this meeting. Record, p. 460. This meeting was continued until March 25, 1986. On March 21, 1986, Hardy designated Arthur as his proxy for the continued meeting. Record, p. 459. On March 25, 1986, the shareholders' meeting resumed, and Arthur, personally and as Hardy's proxy, waived notice of the meeting. Record, p. 461. The shareholders continued to value the stock at $2000.00 per share. Record, p. 461.

At the March 6, 1987 shareholders' meeting, upon a motion made by Arthur and seconded by Hardy, the Article IV price was established (or continued) at $2000.00 per share. Record, p. 462. At the April 11, 1988 shareholders' meeting, the Article IV value was established at $3000.00 per share. Record, p. 470. Hardy never objected to these redeterminations and participated in them. Hardy's argument on this point is without merit and does not create an issue of material fact.

to 1986. There is no material issue of fact presented here.

■ Hardy's third and fourth proposed questions of fact arise from Hardy's allegation that the Defendants failed to provide him with the financial report for the fiscal year ending on February 28, 1988. The failure to provide this report is the basis for his claims that the Defendants misrepresented Sash and Door's financial condition,[4] withheld Sash and Door's true financial condition, and misrepresented the stock's value. Because these claims are based on Hardy's assertion that the Defendants were under a fiduciary duty to provide him with the financial report or otherwise disclose the information contained therein, they will be discussed together.

Hardy asserts the Defendants were under a fiduciary duty to provide him with the financial report or otherwise disclose such financial information to him. Hardy asserts two sources for this duty. The first is that the shareholders of a closely held corporation stand in a fiduciary relationship and must deal openly, honestly, and fairly with one another and the corporation. *Krukemeier, supra*, at 888. Hardy asserts that a duty was imposed upon the directors to provide this information to him regarding the financial report. However, this shareholder fiduciary duty is limited when a director-shareholder buys or sells corporate stock for his own account. *Fleetwood Corp. v. Mirich* (1980), Ind. App., 404 N.E.2d 38.

■ *Fleetwood* dealt with whether a corporate director had a fiduciary duty to inform the shareholders of an appraisal. While *Fleetwood* is factually different because there was no buy and sell agreement, its legal principle regarding duty is applicable. The stock value in *Fleetwood* was dependant on an appraisal, and the existence of the fiduciary duty to disclose turned upon whether the corporation or the director, individually, was acquiring the stock from the shareholder. A corporate director acting for the corporation in a purchase of its own stock stands in a fiduciary relationship with respect to the shareholder from whom the stock is purchased and is under a duty to disclose to the shareholder the facts affecting the value of the stock. *Fleetwood, supra*, at 47. However, a corporate director who sells his personal shares or buys shares from other shareholders for his personal ownership owes no fiduciary duty to disclose information he possesses regarding the value of the stock to the other shareholders, provided that, such a sale does not affect the general well-being of the corporation. *Id.*, at 46, citing *Yerke v. Batman* (1978), 176 Ind. App. 672, 376 N.E.2d 1211, *trans. denied.* In *Fleetwood*, the stock was acquired by a director for the corporation, and the fiduciary duty was imposed to require disclosure of the information. *Id.*, at 47.

The Agreement in the present case deals with the sale of stock between the shareholders. It does not represent a transaction between the corporation and a shareholder. Additionally, unlike *Fleetwood*, where the valuation was dependant on the appraisal, the 1978 Agreement's Article IV valuation is determined by the mutual agreement of the parties and not by the financial report. Therefore, there was no duty to disclose the financial report.

Hardy's second contention as to a fiduciary duty is also based upon *Fleetwood, supra.* Hardy argues that it imposes on the Defendants a duty to treat Hardy as a shareholder, rather than a director, because Hardy asserts he only had a limited role in corporate management. The record here does not demonstrate that Hardy was a "limited role director". The record reflects that Hardy ran the corporation in the 1960s, and as time passed, Hardy concentrated his efforts on sales. Hardy remained familiar with the operation of Sash and Door, and was Sash and Door's top salesman. He was present when large dividends were declared. He received annual

---

4. Hardy's impression that the company was in "bad straights" arose because he was not receiving his commissions. However, "[i]n the last few years, I knew the company was making money[,] and I started getting paid [my commissions] after Scott took over [in 1986]." Record, p. 413.

"K–1" tax forms from the corporation, and his wife received information and assistance on how to prepare their tax returns from the corporation. Hardy was also shown Sash and Door's ledger and other financial information on different occasions. Hardy was not a director unfamiliar with Sash and Door's operation. Hardy was not under *Fleetwood's* "limited role director" exception, and the Defendants were under no affirmative duty to disclose the financial report.

Moreover, Hardy's asserted affirmative duty to disclose incorporates a claim that the financial report is relevant to the Article IV determination. The parties at the formation of the Agreement stated the Article IV value would be redetermined based on the mutual agreement of the parties. The method of valuation is for the parties to determine, not the courts. *Krukemeier, supra,* at 890. If the parties intended to use "book value" or some other group of figures in the financial report, they could have drafted the Agreement using that language. *See, Shortridge v. Platis* (1984), Ind.App., 458 N.E.2d 301, *trans. denied* (where the parties to the agreement partially based the stock valuation on "book value"). Hardy asks the court to modify Article IV to provide that the stock value shall equal the retained earnings in the February, 1988, financial report divided by the number of outstanding shares of stock. While the financial report has relevance for other corporate purposes, the parties here chose not to make it relevant for their redetermination under Article IV.

Because there is no material issue of fact as to the Defendants' breach of the Agreement, the trial court correctly granted summary judgment on the breach of contract issue. The parties expressed their intent on the method of valuation. The transfers between 1978 and 1986 were within the terms of the Agreement.

### B.

 Hardy asserts claims of constructive fraud and fraud in the determination of the Article IV value. Constructive fraud consists of a duty existing by virtue of the parties' relationship, a representation or omission which violates that duty, and detrimental reliance on the representation or admission by the individual to whom the duty is owed. *Medtech Corp. v. Indiana Ins. Co.* (1990), Ind.App., 555 N.E.2d 844, 847, *trans. denied.* Fraud is a material representation of a past or existing fact, which is false, made with knowledge or reckless disregard of its falsity; and which causes reliance to the detriment of the person relying upon it. *Medtech, supra,* at 848. To obtain summary judgment as to the constructive fraud or fraud claim, the Defendants need only show that the undisputed material facts negate at least one element of the plaintiff's claim. *Sanders v. Townsend* (1987), Ind.App., 509 N.E.2d 860, 862, vacated in part, *Sanders v. Townsend* (1991), Ind., 582 N.E.2d 355.

 The breach of a fiduciary duty may form the basis of a claim for constructive fraud. *Id.,* at 864. While *Krukemeier, supra,* imposes a fiduciary duty on the shareholders of a closely held corporation, under *Fleetwood, supra,* and *Yerke, supra,* there is no fiduciary relationship when a director-officer sells or purchases stock for his own account. The Agreement at issue here deals with the sale of stock between shareholders. See discussion, *supra,* part (A). The existence of a duty is a question of law and presents no issue of material fact. Because there is no fiduciary duty under these facts and because the parties are not standing in a confidential relationship, there can be no constructive fraud. Additionally, the same reason negating the fraud claim also negates the constructive fraud claim.

 Basically, Hardy claims that Scott's recommendation was fraudulent. He contends the recommendation was fraudulent because the figures contained in the financial report are higher.[5] Scott's

---

**5.** Sash and Door's retained earnings in the February, 1988, financial report were $848,513.00. After the $2500.00 per share dividend was de-

clared on April 11, 1988, the retained earnings would be decreased by $250,000.00. Hardy as-

recommendation precipitated Arthur's motion to increase the Article IV value. This motion was seconded by Rowe. The fraud claim must fail because: (1) Hardy failed to demonstrate any material misrepresentation of past or existing facts; (2) Hardy had no right to rely on the alleged representations; and (3) Hardy presented no evidence of detrimental reliance. The trial court correctly granted summary judgment because Hardy failed to demonstrate that a material fact was represented.

Hardy contends that Scott's recommendation of $3000.00 per share was a material fact. Scott's recommendation to the Board of Directors was a representation of value. " 'Representations as to value cannot ordinarily constitute fraud because they are generally to be regarded as mere expressions of opinion or "trader's talk" involving a matter of judgment and estimation as to which men may differ.' " *Wisconics Engineering Inc. v. Fisher* (1984), Ind.App., 466 N.E.2d 745, 756, *trans. denied* (quoting 37 C.J.S. Fraud 334, § 57). Hardy recognized that the stock of a closely held corporation has little, if any, value to outsiders. Appellant Brief, p. 43. Indiana allows these corporations' shareholders to enter into buy and sell agreements to fix the value of such stocks. *See Shortridge, supra,* and *Stech, supra.* The Article IV value was not related to the financial report and was to be determined by the mutual agreement of the parties. Expressions of value used to arrive at a mutually agreed upon price are opinions and do not constitute misrepresentations of past or existing facts.

Hardy contends that he reasonably relied on Scott's recommendation. The requirement of reasonable prudence in a business transaction is not extended so as to permit fraud on the unwary. *Carrell v. Ellingwood* (1981), Ind.App., 423 N.E.2d 630, *trans. denied.* However, as discussed *supra,* in part (A), Hardy was not "the unwary". Hardy and the Defendants were on a level playing field. Hardy, as a di-

serts the stock's market value is greater than $9000.00 per share.

**6.** In addition to Hardy's duty as a director to investigate matters to inform himself prior to

rector and a shareholder, had access to the relevant documents.[6] Hardy has presented no evidence that the Defendants actively concealed financial information from him. The fact that Hardy chose not to make any investigation of the records does not make him "the unwary".

Another reason that Hardy's fraud claim fails is that he fails to show detrimental reliance. Hardy argues that he alone, armed with the information in the financial report, could change the Article IV price. This argument ignores the terms of Article IV requiring the price to be reached by *mutual agreement of the parties.* One shareholder alone cannot dictate the Article IV value to the other shareholders. Hardy could have disagreed with the recommendation of $3000.00. However, under Article IV's terms, the price in effect would continue until a new price was determined. Therefore, if one shareholder had refused to agree to the $3000.00 per share price, then the Article IV stock price would have remained at $2000.00 per share.

## II.

### Conspiracy Claim

▆ Hardy further contends that the Defendants conspired to defraud him with their misrepresentations of financial conditions to induce the sale of stock. In Part I, it was determined the Defendants did not misrepresent Sash and Door's financial condition, and there was no duty to disclose the financial report to Hardy. Therefore, Hardy is asserting a conspiracy in Scott's and Rowe's decision to purchase his stock under Article III of the Agreement. A civil conspiracy is a combination of two or more persons engaging in a concerted action to accomplish an unlawful purpose, or to accomplish some lawful purpose by unlawful means. *Boyle v. Anderson Fire Fighters Ass'n.* (1986), Ind. App., 497 N.E.2d 1073, *trans. denied.*

voting, Hardy also had a statutory right as a shareholder to examine the corporate financial records under IND.CODE 23–1–53–1 (Supp. 1992).

Under Article III, upon termination of Hardy's tenure as a Sash and Door officer, "[Hardy] *shall sell* and the surviving Stockholders of the Corporation *shall buy all of his shares* of capital stock in the Corporation at a price determined in accordance with the provisions of Article IV." Record, p. 29 (emphasis added). Under the Agreement, Hardy was obligated to sell his stock to the remaining stockholders upon termination of his status as an officer. Hardy fails to show an unlawful purpose or an unlawful means in the Defendants' exercise of their rights under the Agreement. The trial court properly granted summary judgment on this issue.

### III.

### Punitive Damages

It is well settled that punitive damages may be assessed by the jury, within their sound discretion, guided by proper instructions given by the court. *Hibschman Pontiac, Incorporated v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845. However, a party has no right to punitive damages if he is not awarded compensatory damages in the form of a judgment. *Indiana & Michigan Elec. Co. v. Harlan* (1987), Ind.App., 504 N.E.2d 301, *trans. denied.* Because summary judgment was properly granted on the issues of breach of contract, fraud, constructive fraud, and conspiracy, Hardy will not be granted compensatory or punitive damages on these issues.

We affirm.

HOFFMAN and SULLIVAN, JJ., concur.